No. 2703.—HELEN DEWEY *v.* T. J. BIRD, Sheriff, et al.

The execution of a judgment can not be restrained by injunction, by a third party, who holds the property seized by a simulated title.

APPEAL from District Court, parish of East Baton Rouge. *Posey, J. R. W. Knickerbocker* and *Joseph Joor,* for plaintiff and appellant. *A. S. Herron* and *Burgess & Chaney,* for defendants and appellees.

HOWELL, J. Plaintiff has enjoined the sale of certain property, seized by the sheriff under executions in several suits against A. P.

Converse, her stepfather, on the ground that she is the owner and possessor thereof, by virtue of an authentic act of sale from her brother, Stephen Dewey.

The defense is, that the property seized really belonged to said A. P. Converse, the judgment debtor, the land having been purchased with his funds from one James A. Vance, by Stephen Dewey, a stepson, who sold it to plaintiff, neither of whom had any means, and the personal property, having been removed by him (Converse) from West Feliciana, and all of which was in his possession and control at the date of the seizure, and that all of said transactions were simulations to cover his property. Judgment was rendered in favor of the defendants, and plaintiff appealed.

In August, 1865, A. P. Converse, who then resided with his family (including the Deweys) in West Feliciana, entered into a written agreement with J. A. Vance, in East Baton Rouge, to purchase the land and some of the personal property in controversy, for the sum of $4500, and delivered to him, as part of the price, some notes amounting to $3741 19, made on the third of August, 1865, by R. D. Day, to the order of and indorsed by R. H. Day, and due on the third of each month from February to August, 1866; the title not to be passed until the balance was paid in cash. Vance says Converse stated at the time, that he was buying for another party, but the name was not given. On the twenty-second of September following, a notarial act of sale of said property was executed in the name of Stephen Dewey, Converse being present and acting as agent, although Dewey was also present and signed the act. The consideration expressed in the act was four notes of $1125 each, made on that day by Dewey, to the order of Vance, due at six, eight, ten and twelve months, and secured by mortgage on the land, and were given up to Converse, who, Vance says, "was acting all through as agent for Dewey." On the first of March following (1866), about a month after the maturity of the first "Day note," Stephen Dewey sold the same property and some additional movables, to his sister, the plaintiff, (both describing themselves as residing in West Feliciana), for the sum of $5000, the purchaser assuming to pay the notes, amounting to $4500, given by the vendor, on the twenty-second of September, 1865, to Vance, and the balance acknowledged to have been paid in cash. Miss Dewey says that she was the holder of the seven "Day notes," and, through her stepfather, exchanged them with Vance for her brother Stephen's notes, paying the difference ($760) in cash. But Vance says that he received the "Day notes" from Converse, in August, 1865, before her brother's notes were made, and Day says he paid all of them to Vance, one of them falling due before the sale from Stephen Dewey to plaintiff. She and Vance could not have had them at the same time, and the exchange could not have been made before her brother's notes were

in existence. She says she obtained the "Day notes" from Converse, in payment of "important services rendered during the war, in March, 1865, when the drug store owned by Day & Converse, in Baton Rouge, was under seizure by the Federal authorities," and her counsel admits that "the good faith of these sales depends upon the reality of the contract between Mr. Converse and his stepdaughter, Miss Helen Dewey, and the indebtedness of the former to the latter."

On this subject, Day testifies that, during the war, the drug store owned by him and Converse was closed up and put under guard for five or six days. Two or three days after it was closed, he met Miss Dewey at the landing, walked up town with her, informed her that the store was closed, and did not see her again until the store was opened. She did not exhibit or claim to have authority from Converse to act for him in anything connected with the store. He does not know that she made any effort to have it released. She testifies that, in March, 1865, she went from their residence, in West Feliciana, through the military lines to Baton Rouge, to try to get the store released; saw Mr. Day, who told her he thought the matter would be arranged in a few days. She returned home to see Mr. Converse. When she came back, the property had been released. No passes, at that time, were granted, and Mr. Converse could not get to Baton Rouge. He agreed in writing to pay her $5000 for her services in protecting the drug store. Just before the seizure in this suit, she gave the agreement to Mr. Converse, who burnt it. If Mr. Day had not succeeded, she was to use her influence. She was to be paid out of the proceeds of the sale of the store, and, if that failed, she was to have no further claim on him. Day's notes were a portion of the sale of the store.

Alex. Dow testifies that he knew of a transfer or mortgage from Converse to Miss Helen Dewey of Converse's interest in the drug store, to the amount of $5000, for her services in going through the lines and protecting the drug store, which, he understood, was under seizure by the Federals. He heard the agreement read. This was in March, 1865. He understood that if Mr. Day failed, Miss Dewey was to use her influence with the commander. Mr. Converse told him, in August, 1865, he had transferred a part of the notes to Miss Dewey, in payment of her claim of $5000.

It is stated that Miss Dewey was acquainted with the commander at Bayou Sara, and several of the officers of influence at Baton Rouge. From this evidence it may be assumed that Converse agreed to pay Miss Dewey $5000 for her services in effecting the release of the store, in case his partner failed; but neither she nor any other witness says she rendered any such service. On the contrary, the property was released without any effort on her part, and hence she earned nothing under the alleged agreement, which was never completed. But the record leaves little doubt that Converse was the owner of the "Day

notes" when he delivered them to Vance, in August, 1865, and that the subsequent execution of notes and acts of sale between Stephen Dewey and Vance, and between the former and the plaintiff, was devised for the benefit of Converse. The Deweys evidently had no funds with which to purchase property, while Converse was endeavoring to protect and make available the proceeds of his share in the Baton Rouge drug store, sold to his partner. His interest in the plantation in West Feliciana was about to be seized for debts of long standing, and bearing interest from 1851 to 1861, and was sold in the fall of that year. But just before it was seized, he moved all his stock, farming implements, etc., to the land purchased by him from Vance, where he superintended the erection of buildings and the preparation for making a crop, and where he moved himself in January, and his family, including Stephen and Helen Dewey, in July, 1866.

The district judge was correct in declaring the title of plaintiff and that of Stephen Dewey, simulations, and the property to belong to A. P. Converse, and in dissolving the injunction sued out by her.

Judgment affirmed.